811 So.2d 321 (2001)
NCI BUILDING COMPONENTS, Appellant,
v.
Calvin BERRY, Appellee.
No. 1999-CC-01501-COA.
Court of Appeals of Mississippi.
January 16, 2001.
*323 Louis H. Watson, Jr., Vangela M. Wade, Jackson, Attorneys for Appellant.
Hiawatha Northington, II, Attorney for Appellee.
Before McMILLIN, C.J., BRIDGES, and MYERS, JJ.
BRIDGES, J., for the Court:
¶ 1. Calvin Berry filed a claim for unemployment benefits under applicable state law after his job with NCI Building Components (NCI) was terminated. This claim was disputed by NCI on the grounds that Berry voluntarily quit his job and was therefore not entitled to unemployment benefits. Berry's claim went before the Mississippi Employment Security Commission (MESC), and on April 7, 1998, the claims examiner disqualified Berry from benefits under Miss.Code Ann. § 71-5-511(c) (Rev.2000). The claims examiner cited that Berry was not entitled to benefits under the statute because his supervisors did not terminate him from his job with NCI, but rather, Berry voluntarily chose not to return to his employment there even though he had the ability to work, was available for such work and his job as a line operator was available to him.
¶ 2. Berry appealed his decision before the appeals referee of the MESC who affirmed the decision of the claims examiner in finding that Berry voluntarily ended his position with NCI and was therefore not entitled to unemployment benefits. Berry then appealed the referee's decision before the board of review of the MESC. The full board affirmed the decisions of the claims examiner and the appeals referee in denying benefits to Berry.
*324 ¶ 3. Thereafter, Berry brought his claim before the Circuit Court of the First Judicial District of Hinds County, Mississippi, Honorable James Graves presiding. Judge Graves reversed the decision of the MESC, finding that Berry was fired from his position with NCI and was therefore qualified to receive unemployment benefits. Further, Judge Graves opined that the decision of the MESC was not supported by substantial evidence and was arbitrary and capricious. NCI has appealed the circuit court judgment before this Court and prays that this Court will overturn the decision of the lower court and reinstate the decision of the MESC that Berry voluntarily quit his job with NCI and is therefore not permitted to seek unemployment benefits under Mississippi law.

FACTS
¶ 4. Berry was employed by NCI for three and a half years as a line operator before the events leading up to this matter. On Monday, March 16, 1998, Berry reported for work on the night shift and was disciplined for a costly error on his part. Shortly after this incident, on the same day, Berry asked his supervisor how many paid days of sick leave that he had left. His supervisor reported to Berry that he had two paid sick days remaining, at which time Berry told his supervisor that he planned to take those two sick days over the next two work days. No doctor's excuses or orders were presented to his employer regarding his reasons for being absent on the work days of March 17 and 18, 1998. He reported to his supervisor only that he was having trouble operating his line and he did not feel he could do his job and needed to see a doctor. Berry completed his shift on the night of March 16, 1998.
¶ 5. NCI's company policy requires that all employees who take sick or personal leave must call in on each day that they will not be available for work and speak personally with their supervisor about the reasons for their absence. Berry admitted in his testimony before the MESC claims examiner that, on previous occasions where he had been absent from work, he had followed this policy and called in to speak with his supervisor to explain his absence. Berry claims that he spoke directly with his supervisor, Jimmy Thigpen, on March 16, 1998, regarding the sick days that he planned to take on March 17 and 18, 1998, and that therefore, there was no need for him to call in and speak with Thigpen again on those two days. Thigpen testified that he did tell Berry that he could have those days off, but Thigpen did not inform Berry that his permission for Berry to take that Tuesday and Wednesday off would be in lieu of company policy requiring Berry to call in and verify his absence. Berry, however, did not report for work on March 17 or 18, 1998, and did not call in on either of the two days to speak personally with Thigpen as required by company policy. The policy further provides that three consecutive absences without the employee calling in amounts to work abandonment.
¶ 6. On the morning of March 19, 1998, Berry came in to the office to pick up his paycheck. He was scheduled to work the night shift that evening. While Berry was in the office to receive his check, he reported to Wayland Webb, a personnel administrator, regarding two items of business. First, Berry wanted to discontinue having a fee for the laundry service to clean his uniforms deducted from his paycheck. Berry cites the reason for this to be that the laundry service had, on several occasions, caused his uniforms or part of his uniforms to be damaged or lost. He therefore wanted to stop paying for such a *325 service when he did not feel he was getting his money's worth. Webb gave Berry the paperwork to fill out to discontinue this deduction from his paycheck. Secondly, Berry inquired of Webb as to how he could gain immediate access to the moneys in his 401(k) account. Webb explained to Berry that he could not remove the money from his 401(k) account unless he either suffered from one of the hardships set out by the policy or unless he was terminated from the company. Berry asked Webb for the paperwork to remove the 401(k) moneys from his account without further indicating to Webb whether he planned to argue that he was suffering a hardship or whether he planned to terminate his employment. Webb gave the paperwork to Berry without any further questions.
¶ 7. After picking up his check and obtaining paperwork from Webb for these two items, Berry had a conversation with Scottie Williams, one of the supervisors for NCI, before leaving the premises. Berry asserts that during this exchange, Williams terminated him from his employment with NCI. However, Williams testified that he did not attempt to terminate Berry because he was not Berry's immediate supervisor and could not perform such an action. This fact was further corroborated by Thigpen and two of Berry's other supervisors, Billy Taylor and Mike Payne. It was established through all of their testimony at the MESC hearings that only one of the three of them had the authority to fire Berry. They further testified that, not only was Berry not terminated by Williams or any one of them, but they had no reason to want to terminate Berry and wanted him to stay on at the company.
¶ 8. Also, Williams testified at the MESC hearings that Berry was the one who told him that he no longer wanted his job at NCI because the responsibilities were too stressful for him. Williams stated that he told Berry that if he really wanted to quit or to discuss different job options for himself, he should speak with his immediate supervisors. Berry admits that Williams told him to meet with Thigpen about the situation at 3:00 that afternoon before his regular shift, but he chose not to do so. In fact, Williams's testimony was that when he suggested that Berry meet with Thigpen, Berry responded by saying, "f___k it, I don't even care anymore. I took two sick days the last two days, I may take another tonight. I may not even be here." Berry also admits that later that same day, on March 19, 1998, in a phone conversation with Taylor, he was told by Taylor that he had not been terminated because Williams did not have the authority to take such an action. Taylor further told Berry that he wanted Berry to come in that afternoon to meet with him and Thigpen in order to iron everything out because they had no intention of letting Berry go. However, Berry admits that he ignored this request and did not go in the afternoon of March 19, 1998 to straighten things out with his immediate supervisors. He states that his reason for doing so was because he did not want anymore alleged verbal abuse as he claims that he had received from Williams. However, Berry has presented no proof, other than his own testimony, that Williams was verbally abusive to him during their conversation. Taylor testified before the MESC that if Berry had come in to meet with him and Thigpen, Berry would still be employed with NCI because they had not planned to terminate his employment.
¶ 9. Berry did not report to work his shift on March 19, 1998, he did not come in to meet with his supervisors and he never reported back to work at NCI anytime after that day. Berry claims that he did not come in because he assumed he had been terminated by Williams on March 19, 1998, despite the information that he had *326 received from Thigpen telling him that he had not been fired. Berry had another employee return all of his uniforms to NCI on March 23, 1998, the same day that Berry's supervisors filed his termination papers. Thigpen and Taylor testified that they filed the termination papers on Berry because they assumed that, since Berry had been absent from work for so long, that he had quit his job. The termination papers cited that Berry had voluntarily quit his position with NCI without notice to his employer, and they were signed by Taylor and Thigpen. Taylor and Thigpen both testified that they never fired Berry and considered his failure to return to work a "voluntary quit." The MESC agreed with Taylor and Thigpen and found that Berry had abandoned his job without notice and was therefore not entitled to unemployment compensation.
¶ 10. We find that the examiner's decision to deny compensation to Berry was correct and should therefore be reinstated and the judgment of the lower court should be reversed.

STANDARD OF REVIEW
¶ 11. Our standard for reviewing the findings and decisions of an administrative agency such as the MESC is found in Miss.Code Ann. § 71-5-531 (Rev.2000). "In any judicial proceedings under this section, the findings of the board of review as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of said court shall be confined to questions of law." Id. On appeal, the decision of the administrative agency is afforded great deference. The Trading Post, Inc. v. Nunnery, 731 So.2d 1198, 1200 (Miss.1999).
¶ 12. Apart from the statute, this Court has spoken specifically to the standard of review of MESC proceedings: "The denial of benefits may be disturbed only if (1) unsupported by substantial evidence, (2) arbitrary or capricious, (3) beyond the scope of power granted to the agency, or (4) in violation of the employee's constitutional rights." Mississippi Employment Sec. Comm'n v. Noel, 712 So.2d 728(¶ 5) (Miss.Ct.App.1998) (citing Mississippi Comm'n on Envtl. Quality v. Chickasaw County Bd. of Supervisors, 621 So.2d 1211, 1215 (Miss.1993)). Substantial evidence is defined as "such relevant evidence as reasonable minds might accept as adequate to support a conclusion" or "more than a mere scintilla of evidence." Hooks v. George County, Mississippi, 748 So.2d 678, 680 (Miss.1999); Johnson v. Ferguson, 435 So.2d 1191, 1195 (Miss.1983). If it is determined that an administrative agency's decision is not supported by substantial evidence, then:
[I]t necessarily follows that the decision is arbitrary and capricious. An administrative agency's decision is arbitrary when it is not done according to reason and judgment, but depending on the will alone. An action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles.
Mississippi State Dept. of Health v. Natchez Community Hospital, 743 So.2d 973, 977 (Miss.1999) (citing Burks v. Amite County Sch. Dist., 708 So.2d 1366, 1370 (Miss.1998)).
¶ 13. The MESC's decision is rebuttably presumed to be correct. Noel, 712 So.2d at (¶ 5). Employees are "shouldered with the burden of overcoming [this] rebuttable presumption in favor of the Board's decision." Id. Further, the Mississippi Supreme Court provided that a reviewing court may not reweigh the facts in an agency case, nor may it replace the agency's judgment with its own. Nunnery, 731 So.2d at 1200. A circuit court *327 sits as a reviewing court in appeals from decisions made by administrative agencies and, as such, its scope of review is limited to the findings of the agency. Walters v. Mississippi Dept. of Economic and Community Dev., 768 So.2d 893(¶ 8) (Miss. 2000). In other words, the lower court is not sitting as the initial fact-finder, but rather as an intermediate appellate court. Board on Law Enforcement Officer Standards and Training v. Rushing, 752 So.2d 1085(¶ 8) (Miss.Ct.App.1999) (citing Board of Law Enforcement Officers Standards and Training v. Butler, 672 So.2d 1196, 1199 (Miss.1996)). Consequently, the findings of the lower court are not entitled to the same deference that would be afforded to it were it sitting as a trial court. Id. "If the [agency's] decision is founded upon substantial evidence, then it is binding upon an appellate court, i.e., the Circuit Court and this Court." Wilkinson County Bd. Of Supervisors v. Quality Farms, Inc., 767 So.2d 1007, 1010 (Miss.2000).
¶ 14. Under Mississippi's Unemployment Compensation Law, a person is disqualified from receiving benefits if he left work voluntarily without good cause. Miss.Code Ann. § 71-5-513(A)(1)(a) (Rev. 2000). The burden of proving good cause for leaving one's employment voluntarily rests with the employee. Miss.Code Ann. § 71-5-513(A)(1)(c) (Rev.2000); Hoerner Boxes, Inc. v. Mississippi Employment Security Comm'n, 693 So.2d 1343, 1346 (Miss.1997).

LEGAL ANALYSIS
¶ 15. This case, at first glance, appears to be very complicated and convoluted. As the standard of review dictates, we must adhere to the findings of fact made by the board of review of the MESC unless they are fraudulent or unsupported by substantial evidence. We find that the decision of the MESC was supported by substantial evidence. After looking closely at the record, we recognize that, amongst all of the contradictory testimony, there is no direct evidence presented to this Court proving that Berry was fired from his job at NCI other than Berry's own testimony. On the other hand, NCI provided multiple witnesses to corroborate that Berry was not fired from his position at NCI, but rather, he quit his job by not returning for work any day after March 16, 1998.
¶ 16. Berry asserts that he had asked Thigpen for March 17 and 18, 1998 off because he was going to be seeing a doctor on those two days. However, it was the testimony of Thigpen that, although he did tell Berry that he could have those two days for sick leave, he did not intend that Berry could circumvent the policy requiring that he call in to report his absences on the days that he would not be there. Berry claims that the policy provides that, if he acquired advance permission to miss March 17 and 18 for sick leave, he was not required to still call in. However, the policy of NCI reads as follows:
If you are unable to report to work, or if you will arrive late, please contact your manager immediately. Give him or her as much time as possible to arrange for someone else to cover your position until you arrive. If you know in advance that you will need to be absent, you are required to request this time off directly from your manager. He or she will determine when will be the most suitable time for you to be absent from your work.

Clearly, this policy does not explicitly provide that if an employee gives his superior advanced notice, it excuses the employee from calling in on those days as well, contrary to Berry's argument. Furthermore, even if the policy is to be construed as Berry claims, Berry did not report for work on March 19 or March 23, 1998, *328 giving his supervisors adequate reasoning to believe that he did not plan to return to his job, especially in light of the fact that he returned his uniforms to the company by way of another employee on March 23, 1998. Additionally, on the termination sheet filled out for Berry on March 23, 1998, his supervisors indicated that the reason for termination was because Berry abandoned his job without giving notice to his superiors.
¶ 17. Berry's contention that Williams fired him on March 19, 1998, is entirely without any supporting evidence. Williams testified that Berry told him that he could no longer do his job. Williams further told the MESC that he could not have fired Berry because he did not have the authority to do so. Furthermore, it was Williams's testimony that he told Berry to come in and speak with his direct supervisors about any problems on the afternoon of March 19, 1998. Berry not only admitted in his testimony that Williams told him this, but he also admitted that he made the conscious decision not to come in and straighten matters out with Thigpen and Taylor because he did not want to do so. Thigpen and Taylor also testified that they asked Berry to come in that afternoon, separately from Williams suggestion, and that, at the time they talked to Berry, they explained to him that he still had his job and he had not been fired, nor did they intend to fire him. Berry did not return to NCI any day after March 16, 1998. There is no other assumption that this Court can make other than that Berry chose not to return to claim his job after he had been told that it was still available to him. It would appear to this Court that he is now attempting to convince us that he was fired in order to receive compensation for unemployment.
¶ 18. NCI asserts that it may be construed that Berry intended to quit his job at NCI because he discontinued the laundry service for his uniforms and because he acquired the paperwork to remove the money from his 401(k) account. However, we are not convinced that NCI can rest its case on that assumption. We find that Berry could have just as easily done these things for legitimate reasons other than that he intended to quit his job with NCI. For example, Berry testified that he was dissatisfied with the laundry service and did not want to continue to pay for a service for which he was not getting his money's worth. The problems that Berry had previously experienced with the laundry service were verified through the testimony of Berry's supervisors. Also, it has not been shown that Berry actually removed any money from his 401(k) account, but only inquired about doing so and obtained the paperwork to do so. Therefore, while we are of the opinion that Berry did, in fact, abandon his job rather than being fired as he claims, we do not agree that these two actions by Berry constitute evidence on which NCI should hang its hat in this case.
¶ 19. Mississippi Code Ann. § 71-5-513(A)(1)(a) (Rev.2000), provides that if an employee leaves work voluntarily without good cause for leaving, he is disqualified from unemployment benefits. That appears to be the case that we have before us. While we note that Berry might have been capable of making a case for good cause due to his psychological/medical problems, that is not the basis on which he filed this action. From all the testimony provided at the MESC hearings, the assumption that was made by the MESC was that Berry simply decided not to come back to work after March 16, 1998. The statute requires that Berry carry the burden of persuading the agency and the courts of good cause, if there be any. Miss.Code Ann. § 71-5-513(A)(1)(c) (Rev. 2000). We find that Berry has not met *329 such a burden here. He produced nothing for this Court that would indicate that he could no longer perform his job duties. In fact, when Berry was asked by the MESC referee whether his doctor told him that he was not well enough to hold down his job any longer, Berry refused to disclose any information given to him by his doctor regarding his physical or mental state. It was only after the referee ordered Berry to answer her questions that Berry testified that his doctor had diagnosed him with depression and other mental problems. However, at no time did Berry ever testify that his doctor indicated that these problems would prevent him from doing his job. Rather, the only advice that was given to Berry by his doctor, according to Berry's testimony, was that he should talk to his supervisors about the possibility of less job responsibilities. Yet, as we have already discovered through the testimony in the record, Berry did not talk to his supervisors about this or any other problem, but instead opted to neglect to report to work again at any time after March 16, 1998, without any explanation.
¶ 20. The findings of fact by the MESC are, in the opinion of this Court, supported by substantial evidence. Therefore, we find that the MESC decision was binding on the lower court in its capacity as a reviewing court. Quality Farms, 767 So.2d at 1010. As such, we also disagree with the lower court that the decision made by the MESC board of review was arbitrary and capricious as we are convinced that it was based on sound reasoning and an understanding of the facts and principles surrounding this action. Dept. of Health, 743 So.2d at 977. There has been no evidence presented by Berry that those findings were riddled with fraud, nor did he provide any evidence which would tend to outweigh the findings of the MESC, thereby allowing this Court to overturn those findings. Miss.Code Ann. § 71-5-531 (Rev.2000). We are convinced that the lower court committed an abuse of discretion by making its own findings of fact and re-weighing the credibility of witnesses who testified before the MESC. As noted in the standard of review, a reviewing court may not re-weigh facts or further assess credibility absent less than substantial evidence or fraud on the part of the MESC. Nunnery, 731 So.2d at 1200. Thus, we find that the lower court did not give proper deference to the MESC's ruling and the court should have affirmed the decision of the MESC in finding that Berry voluntarily abandoned his job with NCI. Id.; Walters, 768 So.2d at 893; Rushing, 752 So.2d at 1089.
¶ 21. "The underlying purpose of implementing employment security law in Mississippi is to protect those workers not permitted to continue employment through no fault of their own." Sprouse v. Mississippi Employment Security Comm'n, 639 So.2d 901, 902-03 (Miss. 1994). Furthermore, "a terminated employee is afforded protection under the Mississippi Employment Security Law when he is ready, willing and able to work, but when, through no fault of his own, he is unable to do so." McArn v. Allied Bruce-Terminix, 626 So.2d 603, 606 (Miss. 1993). Absent evidence to the contrary, we find that Berry was not only permitted to continue his employment with NCI after March 16, 1998, but he was asked to do so by his supervisors. However, Berry declined to meet with his supervisors about his position with the company and refused to come to work or call in to report his absences to anyone at NCI. As such, we are convinced that Berry may not now seek the protection of the unemployment security laws in this State.
¶ 22. Because we find that the lower court exceeded its authority, we must find *330 that the MESC's decision should be reinstated and Berry should be denied benefits. Nunnery, 731 So.2d at 1200; Chickasaw County, 621 So.2d at 1215. The MESC's ruling must be presumed to be correct here. Hooks, 748 So.2d at 680. Therefore, it is the judgment of this Court that the decision of the lower court be reversed and the MESC's decision reinstated.
¶ 23. THE JUDGMENT OF THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY GRANTING UNEMPLOYMENT BENEFITS TO THE APPELLEE IS HEREBY REVERSED THE DECISION OF THE MISSISSIPPI EMPLOYMENT SECURITY COMMISSION DENYING SUCH BENEFITS IS REINSTATED.
McMILLIN, C.J., SOUTHWICK, P.J., LEE, MYERS, PAYNE, and THOMAS, JJ., concur. IRVING, J., concurs in result only. KING, P.J. and CHANDLER, J., not participating.